# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD SCHNEIDER,<br><br>                    Plaintiff,<br><br>          vs.<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>                    Defendant | )  Case No.: 1:11cv0707 AWI DLB<br>)<br>)  FINDINGS AND RECOMMENDATIONS<br>)  REGARDING PLAINTIFF'S SOCIAL<br>)  SECURITY COMPLAINT<br>)<br>)<br>)<br>)<br>)<br>) |

## BACKGROUND

Plaintiff Donald Schneider ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed for DIB on September 25, 2007. AR 136-40. He alleged disability since August 31, 2007, due to arm numbness, depression and anxiety. AR 155. After being denied

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 82-85, 90-94, 96-97.  On November 17, 2009, ALJ James P. Berry held a hearing.  AR 27-65.  ALJ Berry denied benefits on January 7, 2010.  AR 12-22.  On March 3, 2011, the Appeals Council denied review.  AR 1-5.

Hearing Testimony

ALJ Berry held a hearing on November 17, 2009.  Plaintiff appeared with his attorney, Jeff Milam.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 29.

*Plaintiff's Testimony*

Plaintiff was born in 1959.  He is 5'1" and weighs approximately 190 pounds.  He has a VA disability of 40 percent, which is service connected, as he broke his arm in Italy and has nerve damage in the right arm, along with tinnitus.  AR 31-33.

Plaintiff completed the 12th grade and can read and write.  After 12th grade, Plaintiff received a heavy equipment operator's license and was in the Marine Corps for six years.  AR 33.  Plaintiff did not believe that he could return to any of his past jobs on a full time basis.  He last worked at the Internal Revenue Service ("IRS") as a mail clerk, but stopped working because of pain after a fall in December 2004.  AR 35.  Since that time, he has had problems with his back.  AR 54-55.  He tried to work as a janitor at the veteran's halfway house, but could not sweep and mop because his arm hurt.  AR 39-41.

Plaintiff claimed he cannot work because of his back, right shoulder, left arm and depression.  He receives treatment for these issues at the VA Medical Center in Fresno, California.  AR 35-36.

Plaintiff has been seeing Dr. Howsepian since 2002 or 2003 for his depression.  Plaintiff experiences anger, distrust of people and low energy.  He sleeps an average of 10 hours a day, some of it during the daytime, and he wakes up between one and three o'clock in the afternoon.  AR 39.  He also uses a CPAP machine for apnea.  AR 55.

Plaintiff explained that there is nothing they can do to treat his low back.  He has tried physical therapy and occupational therapy, but nothing seems to work.  He has constant, throbbing pain and cannot get comfortable.  AR 42-44.  Plaintiff also has hearing aids, which he wears all the time.  If there is a lot of background noise, he has trouble hearing.  AR 44.

Plaintiff estimated that he could probably lift five to ten pounds.  On a good day, he can sit for half an hour and can stand or walk for 15 minutes.  In an eight-hour day, he can lie down two or three hours, sit four hours and stand two hours.  He has trouble reaching overhead with his left arm.  In an eight-hour day, he can reach out and grab things for one or two hours because of his back, shoulders and wrist.  He can wash dishes for 15 or 20 minutes.  He can concentrate for 5 or 10 minutes.  Due to his depression, he gets irritated very easily and the stress of getting to work on time and dealing with an eight-hour day would be a problem for him.  AR 44-49.

Plaintiff has a history of substance abuse and last used alcohol or drugs about three and a half years before the hearing.   He attended an outpatient Chemical Dependency Treatment Program, but has stopped attending AA meetings.  AR 49-51.

On a normal day, Plaintiff can get himself something to eat, take care of his dressing and bathing, and watch TV or visit one of his friends.  He sometimes reads, but not for very long.  He also is involved with his synagogue.  He takes care of and cleans his own apartment.  AR 51-54.  He has a driver's license and drives.  He likes to golf and to watch T.V. and movies.  He was restoring a 1948 Dodge truck, but had to sell it.  AR 56-59.

Plaintiff clarified that he resigned from his job in 2007 because of pain.  He also was having some issues at the IRS involving other people, which was one of the major reasons he stopped working.  AR 56.

*Vocational Expert's Testimony*

The VE identified Plaintiff's past relevant work at the IRS as a clerk, which was light, SVP three, and semiskilled.  AR 60.

For the first hypothetical, the ALJ asked the VE to assume an individual 50 years of age with a 12th grade education and Plaintiff's past relevant work experience. The ALJ asked the VE to assume that this individual could lift and carry 100 pounds occasionally, 50 pounds frequently, could stand, walk and sit six hours each, could perform simple repetitive tasks, could maintain attention, concentration, persistence and pace, could relate to and interact with others, could adapt to usual changes in work setting and could adhere to safety rules. However, this individual must avoid concentrated exposure to loud noise. Given these limitations, the VE testified that this individual could not perform Plaintiff's past work, but could perform other jobs in the national economy. AR 60-61.

For the second hypothetical, the ALJ asked the VE to assume an individual with the same vocational background who could lift and carry five to ten pounds, could stand two hours and sit four hours, would have difficulty maintaining attention, concentration and interaction with others, would need frequent rest breaks lasting approximately two hours, could not reach overhead with the left, non-dominant extremity, would have difficulty reaching more than one hour per day and would have difficulty using the dominant, right upper extremity more than 15 to 20 minutes at a time. Given these limitations, the VE testified that such an individual could not perform Plaintiff's past work or any other work in the national economy. AR 62-63.

Medical Record

*Physical Impairments*

On July 25, 2005, Plaintiff underwent a neurological evaluation by Dr. Arvind Mehta. Following an examination and review of nerve conduction studies, Dr. Mehta diagnosed Plaintiff with residual hephalgesia in an oval shaped area on the left forearm due to residual right radial nerve findings. Plaintiff also had mild left median carpal tunnel syndrome and borderline median carpal tunnel syndrome. Plaintiff also had chronic pain symptoms in the left upper extremity with spread of pain into the neck, left should blade area, upper back and in the

bioccipital and bitemporal head regions.  Dr. Mehta opined that Plaintiff's complaints of a right shoulder condition were totally subjective and were difficult to evaluate objectively because there were no physical findings.  Plaintiff's reported headaches were not frustrating and he continued to function.   AR 238-39.

In December 2005, Plaintiff underwent surgery for a right wrist fracture.  AR 285-86.

On June 27, 2007, Plaintiff sought emergency treatment for upper back and shoulder pain radiating to his chest.  On physical exam, Plaintiff's spine was tender at T8/9, but he had full range of motion in both shoulders with normal power and tone.  He was diagnosed with a back sprain and chest wall pain.  AR 273-79.

On July 9, 2007, Plaintiff was diagnosed with sleep apnea by history.  AR 264-65.

On July 30, 2007, Plaintiff complained of pain in his neck and shoulders.  On exam, Plaintiff's neck and shoulders were tight, consistent with a diagnosis of fibromyalgia made worse by stress at work and the repetitive motion and lifting involved in sorting and delivering mail at work.  He also had hypertension and obesity.  Plaintiff was considering disability.  AR 257.

In October 2007, Plaintiff underwent reconstructive surgery of his jaw and chin related to obstructive sleep apnea.  AR 296, 299-73.

On November 12, 2007, Dr. Judith Miller completed a consultative internal medicine evaluation.  Plaintiff primarily complained of left arm numbness, chronic depression and anxiety. He reported his activities of daily living to include light house work, such as vacuuming and mopping, and light yard work.  As a hobby, he was restoring a 1948 Dodge Truck.  There were no abnormal findings on physical examination.  Dr. Miller opined that Plaintiff was able to demonstrate heavy activity with standing and/or walking and no restrictions with sitting, lifting and carrying.  He had no postural, manipulative, communicative or environmental difficulties. AR 374-78.

A January 2008 sleep study showed mild sleep apnea.  AR 465.

On February 11, 2008, Dr. Mehta performed a compensation and pension examination. Dr. Mehta diagnosed left arm numbness, which was stable and unchanged, moderate left-sided carpal tunnel syndrome not requiring surgery or brace, mild right sided carpal tunnel syndrome minimally symptomatic and not requiring any operation or treatment, and muscle tension headaches induced by physical exertion in the upper extremity muscles.  AR 457-60.

On February 25, 2008, Plaintiff complained of left neck and shoulder pain.  On exam, he was tender in muscles around the shoulder.  AR 455.  The next day, Plaintiff was issued a left wrist splint for carpal tunnel syndrome.  AR 554.

On March 21, 2008, Plaintiff was approved for chiropractic treatment and physiotherapy for 12 visits.  AR 551.  On April 16, 2008, Plaintiff reported that the chiropractic regimen had been helpful, but as soon as he started using his left hand, his shoulder became painful.  AR 776.

On May 2, 2008, Plaintiff sought emergency room treatment for left side shoulder and neck pain.  Plaintiff had run out of Vicodin.  On examination, Plaintiff was tender to the left very superior aspect of trapezius with no direct left shoulder tenderness. His range of motion was intact, but with discomfort.  Plaintiff received a Toradol injection.  AR 762-66.

On May 27, 2008, Plaintiff sought treatment from Dr. Vishal Pall for consideration of a left shoulder steroid injection.  Plaintiff reported progressive pain in the left shoulder, with associated neck pain, scapular pain and numbness. On examination, Plaintiff had pain limited neck range of motion and pain limited left shoulder abduction.  Dr. Pall assessed left shoulder impingement, subacromial bursitis, cervical spine degenerative disc disease and rule out cervical spine stenosis.  Plaintiff was given a steroid injection.  AR 753-54.

On June 16, 2008, Plaintiff sought treatment for pain to his left shoulder.  AR 744.

On July 3, 2008, a left shoulder x-ray showed no fracture, dislocation or osseous abnormality.  AR 515.  On the same day, Dr. John Kwock completed an orthopedic surgery consult for left shoulder impingement.  Plaintiff was prescribed a trial of NSAIDS.  AR 546-47.

On July 5, 2008, Plaintiff sought emergency room treatment after he fell and bruised the left side of his body, low back and hips.  X-rays of Plaintiff's hips and ribs showed no fracture. He was to continue NSAIDS.  AR 735-40.

On August 4, 2008, Dr. Kwock saw Plaintiff for left shoulder abduction pain.   Plaintiff reported that it was not abduction of the arm that caused pain, but pain in the base of the neck that radiated into the left shoulder and was aggravated with rotational movement of the head.  Dr. Kwock believed that Plaintiff's complaints had a peripheral nerve quality although an EMG in 2007 was not suggestive of it.  Dr. Kwock requested a bone scan and a MRI of the left shoulder. AR 725-26.

A cervical spine x-ray completed on August 4, 2008, showed minimal degenerative changes and a subsequent bone scan suggested degenerative arthritis and degenerative changes of the first cervical vertebrae.  AR 508-12.  MRI results completed the next day suggested mild supraspinatus tendinosis of the left shoulder.  AR 507.

On August 12, 2008, Dr. Kwock considered Plaintiff's c-spine x-rays, bone scan and MRI and believed Plaintiff might have a shoulder impingement of some degree.  Plaintiff was to have an injection.  AR 723-24.

On August 20, 2008, Plaintiff complained of ongoing shoulder pain.  Dr. Alan Cohen, a primary care physician, assessed chronic shoulder impingement/rotator cuff and referred Plaintiff to orthopedics.  AR 720.

On November 5, 2008, Dr. Kwock evaluated Plaintiff's shoulder abduction issues.  On exam, Plaintiff had painful abduction of the shoulder.  A review of a c-spine series and a MRI were "not very suggestive of a disc protrusion."  Plaintiff was referred to neurosurgery for possible radiculopathy before surgical treatment.  AR 703-04.

On December 3, 2008, Plaintiff sought emergency room treatment for chronic bilateral shoulder pain.  Plaintiff reported no relief from Vicodin and requested a Ketorolac shot.  On

exam, he had limited range of motion in both shoulders and was given a Ketorolac shot.  AR 698-701.

On December 5, 2008, Plaintiff sought treatment for complaints of chronic pain in his neck and shoulder.  He reported receiving a shot two days prior for pain.  As Plaintiff was on a high dose Vicodin, he was given a Toldol injection.  AR 693-95.

On December 8, 2008, Plaintiff complained to Dr. Cohen that his shoulder pain was worsening.  AR 690.

On January 5, 2009, Dr. Cohen met with Plaintiff regarding his chronic low back and shoulder pain.  Due to the pain, Plaintiff could not do the tasks that he enjoyed.  He had disturbed concentration, depression, anger and irritability.  Dr. Cohen commented that medication was less risk than alternative therapies.  AR 680-81.

On February 6, 2009, Plaintiff saw De Davis, a nurse practitioner, during a pre-operative appointment for his shoulder.  Plaintiff doubted that surgery would help him.  Nurse Davis had the impression that Plaintiff's motives for surgery were based on his homelessness, financial stressors and other stressors, including his belief that disability would be curtailed if he did not have surgery.  During his discussion with Nurse Davis, Plaintiff became agitated and used profanity.  Plaintiff also used profanity when Dr. Kwock attempted a consultation.  AR 671-73.

On June 10, 2009, Dr. Gopi Kasturi completed a neurological examination.  On exam, Plaintiff has multiple tender points in the left trapezius, 4/5 strength in his left upper extremity and decreased sensation to pinprick in the left upper extremity.  Dr. Kasturi diagnosed left cervical radiculopathy based on MRI results and physical examination.  Plaintiff also had left neck/shoulder myofascial pain.  Plaintiff received a myofascial trigger point injection in the left trapezius and rhomboid.  AR 534-37.

On July 8, 2009, Plaintiff underwent a physical therapy evaluation for C spine strengthening and stabilization, along with cervical traction.  Plaintiff reported left-sided neck

pain for more than five years, along with headache, left shoulder pain and intermittent numbness down to his left hand.  On exam, Plaintiff was dysthymic with a flat affect.  His c-spine range of motion was limited by subjective pain and he had diminished sensation in his left upper extremity.  He also had tightness in his left trapezius, levator, rhomboids, supraspinatus and suboccipitals.  The physical therapist opined that Plaintiff's subjective symptoms were consistent with chronic cervical spine radiculopathy with resultant myofascial pain syndrome.  Plaintiff had significant tightness throughout the cervical spine and thoracic musculature, which should improve with therapeutic exercise and stretching.  AR 527-29.

Plaintiff attended physical therapy five times between July and August 2009.  AR 845, 850-51, 852, 854-55, 862.  However, on September 8, 2009, the physical therapist noted that Plaintiff had not attended any physical therapy sessions since August 19, 2009, and if there was no word from Plaintiff by September 21, 2009, he would be discharged from physical therapy for his c-spine.  AR 836.

On July 16, 2009, Dr. Martin Lauber completed a general medical evaluation.  On examination, Plaintiff's shoulders did not reveal any incapacitation, reduction in joint excursion, fatigability or loss of coordination.  Dr. Lauber diagnosed cervical radiculopathy affecting the left arm, dysesthesia and hypoesthesia to the left upper arm and carpal tunnel syndrome based on earlier nerve conduction studies.  Dr. Lauber commented that radiographs showed degenerative disease with disc herniation at two levels, which appeared to correspond with Plaintiff's pain.  Plaintiff was not limited in terms of walking and did not have issues of unemployability or limitations of his daily activities due to a prior leg injury while in the service.  AR 569-74.

On July 17, 2009, Dr. Mehta completed a neurological evaluation.  Plaintiff complained of daily headaches for which he took Oxycodone.  He also complained of numbness in his upper extremities and in both legs, but this did not limit his walking, standing or sitting and doing all other activities.  AR 565.  On exam, Plaintiff's neck movements were performed fairly well and

he had normal power and coordination in both upper and lower extremities. He had reduced sensation to pinprick on the lateral aspect of his left forearm distally corresponding to left regional nerve distribution. He also had reduced sensation to pinprick in stocking distribution in both lower extremities. Tinel signs were positive on the left median nerve. Following nerve conduction studies, Dr. Mehta concluded that Plaintiff had normal findings in both upper extremity nerves and there was no evidence of carpal tunnel syndrome on either side. In his lower extremity nerves, there was evidence of peripheral neuropathy. Dr. Mehta diagnosed chronic headaches of muscle tension type, idiopathic polyneuropathy metabolic in origin causing paresthesia in both lower extremities and reduced reflexes and sensation. Plaintiff did not have any cervical radiculopathy symptoms despite cervical spondylosis and bulging disc on a MRI scan. Dr. Mehta commented that Plaintiff's headaches were not causing any functional impairment or disability and that Plaintiff did not have physical limitations from polyneuropathy. AR 564-69.

On October 5, 2009, Plaintiff received follow-up care from Dr. Singh for chronic left sided neck and shoulder pain. On exam, the left side of his neck, shoulder and pectoral muscle were stiff and tender to deep palpation. Dr. Singh assessed shoulder and neck muscle strain, cervical radiculopathy, hypertension, hearing loss, hypothyroidism, obesity and sleep apnea. AR 830.

On October 19, 2009, Plaintiff received follow-up treatment with Dr. Kasturi. Plaintiff continued to be in significant pain. On exam, he had multiple tender points in the entire paraspinal musculature. Plaintiff wondered if medical marijuana would help him, but Dr. Kasturi explained it would not help affect the basic pathology. AR 825.

*Mental Impairments*

On July 25, 2005, Plaintiff saw clinical psychiatrist, Dr. Avak A. Howsepian and discussed behavioral dyscontrol. Plaintiff's problems at work appeared insoluble and he felt he

was going to "get screwed."  AR 260.  On mental status, Plaintiff was more depressed, dysphoric and irritable.  Dr. Howsepian diagnosed dysthymic disorder with adjustment overlay, anxiety nos, pain disorder and rule out delayed onset PTSD.  Plaintiff's venlafaxine and buspirone were increased to the maximum dosage.  AR 260.

Between June 2006 and July 2009, Plaintiff attended a Chemical Dependency Treatment Program, which included counseling and maintenance.  AR 205-33.  In group counseling, Plaintiff routinely was noted to be reasonable, responsive and appropriate and cooperative with staff and with peers.  AR 241-43, 245, 449, 452-53, 457, 462-63, 469, 555.

On July 23, 2007, Plaintiff's wife called Dr. Howsepian.  She stated that they had an argument and Plaintiff turned over furniture, broke things, tried to dump the fish tank and was out of control.  He also did not go to work, did not call in and was AWOL.  AR 262.

On August 6, 2007, according to notes from Thomas O'Rourke, an addiction therapist, Plaintiff reported that he told the Fresno IRS Director that "he was a piece of [excrement] and deserved or needed to be flushed" and that "he ought to be put under the jailhouse."  Plaintiff believed his words were misunderstood as a threat.  Three detectives came to his home and took his IRS badge, and Plaintiff was placed on leave.  AR 254-55.

On August 7, 2007, Plaintiff sought emergency psychiatry treatment for depression.  AR 252-53.  Dr. Tirath Gill indicated that Plaintiff was under increased stress because of arguments with a supervisor at work.  Plaintiff was "on the max of meds" and tended "to deny usefulness of meds or any suggestions."  AR 251.

On August 13, 2007, Plaintiff reported in group therapy that he had made statements, which were interpreted as threats, to an IRS supervisor.  Plaintiff described himself as "the kind of fellow who will state and speak his mind in [ ] a direct, rather blunt fashion, if he is so moved by events."  AR 250.  Therapist O'Rourke noted that Plaintiff's mood was within his normal

limits, he was reasonable and responsive and he was appropriate and cooperative with staff and peers.  AR 250.

On August 16, 2007, Plaintiff called Dr. Howsepian and reported that the IRS wanted to get rid of him because he said something that was taken as a threat.  Plaintiff stated that he should never have returned to work and that he wanted to go out on medical retirement.  AR 249.

On August 20, 2007, Plaintiff expressed to Dr. Howsepian that he was thinking about resigning and seeking medical retirement.  Plaintiff also asked whether he had PTSD, stating that his depression and anxiety were no better and that his sleep was suboptimal.  On mental status, Plaintiff was dysphoric, depressed and subdued with a blunted affect.  Dr. Howsepian diagnosed dysthymic disorder with adjustment overlay, anxiety disorder NOS, pain disorder (shoulder) and rule out delayed onset PTSD.  AR 247-48.

On August 27, 2007, Plaintiff attended group counseling for his addiction and reported that he met with his psychiatrist regarding his decision to resign.  His doctor had encouraged him to resign quite some time back and he felt resigning was the correct decision.  Therapist O'Rourke noted that Plaintiff's mood was within his normal limits, he was reasonable and responsive and he was appropriate and cooperative with staff and peers.  AR 247.

On August 29, 2007, Plaintiff informed Dr. Howsepian that he had resigned from the IRS and was seeking disability.  They discussed that Dr. Howsepian had "not (yet) diagnosed him with PTSD."  On mental status exam, Plaintiff was angry and dysphoric.  His depression screen was positive.  AR 245-46.

On September 20, 2007, therapist O'Rourke noted that Plaintiff's mood was within its normal limits and that he was appropriate and cooperative with staff and peers.  AR 245.

On September 11, 2007, Dr. Howsepian wrote a letter regarding Plaintiff's psychiatric status.  According to the letter, Plaintiff had current diagnoses of dysthymic disorder (with significant adjustment overlay), anxiety disorder NOS, learning disorder NOS, pain disorder and

obstructive sleep apnea.  Dr. Howsepian opined that Plaintiff's psychiatric condition had

worsened appreciably over the past four years.  Plaintiff was "exquisitely sensitive" to stress,

exhibiting both somatic symptoms (tachycardia and hypertension) and myriad psychiatric

symptoms in the face of occupational stressors (perceived repeated harassment resulting in a

hostile work environment).   Plaintiff's symptoms included depression, anxiety, dysphoria,

hopelessness, helplessness, anger, irritability, explosivity, psychomotor retardation, frustration,

tearfulness, pessimism, fatigue, sleep disturbance and marital discord.  Plaintiff had "violently

broken multiple items in his home."  AR 244.  Dr. Howsepian opined that the "protracted

exacerbation" of Plaintiff's anxiety and depressive disorders were "clearly causally linked to

stresses at the IRS caused by repeated instances of harassment resulting in a perceived hostile

work environment."  AR 244.

On January 3, 2008, Steven C. Swanson, Ph.D., completed a consultative psychological

evaluation.  Plaintiff reported resigning from the IRS because "it was a hostile work

environment" and "the Director was a piece of shit."  He stated that he could complete all

activities of daily living, could drive, could work on his 1948 Dodge pickup, and could attend

AA groups.  On exam, Plaintiff had no signs of vegetative depression, his short-term, recent and

remote memories were within normal limits and he maintained satisfactory attention and

concentration.  Psychological tests showed average range of intellectual ability and no relative

weakness in memory functioning.  There was no evidence of any serious psychological

disturbance and Plaintiff's mental and emotional functioning fell within normal limits.  Dr.

Swanson diagnosed alcohol dependence and cannabis abuse in remission and assigned a Global

Assessment of Functioning ("GAF") of 70.  Dr. Swanson opined that Plaintiff could maintain

concentration or relate appropriately to others in a job setting, could understand, carry out and

remember simple instructions and could respond appropriately to usual work situations, such as

attendance and safety.  Dr. Swanson further opined that changes in routine would not be very problematic and there did not appear to be substantial restrictions in daily activities.   AR 387-93.

On January 18, 2008, J. Levinson, Ph.D., a state agency medical consultant, opined that Plaintiff did not have a severe mental impairment.  AR 395-408.

On February 11, 2008, Plaintiff saw Dr. Howsepian and reported that he had resumed going to Temple.  He talked about possible PTSD and complained about not having friends.  On mental status exam, Plaintiff appeared resigned and somewhat depressed, but less angry, irritable and anxious.  Dr. Howsepian assessed dysthymic disorder, anxiety and pain disorder.  Plaintiff was to continue medications and supportive psychotherapy.  AR 460.

On March 12, 2008, Plaintiff's wife called Dr. Howsepian regarding her concern that Plaintiff was more depressed.  She reported that he does not get up all day and he feels the IRS has won because he had to sell his truck.  AR 452.

In April 2008, Plaintiff believed that a motorcycle accident in Italy and head injury might be the cause of his PTSD.  AR 780.  He met with Garry Bredefeld, Ph.D., a clinical psychologist for mental health therapy.  Plaintiff reported stress due to his finances.  He claimed a long history of depression and felt he could not return to work due to back pain.  Dr. Bredefeld diagnosed dysthymic disorder by history and anxiety disorder, NOS, by history.  AR 871.

On June 9, 2008, Dr. Howsepian opined to Plaintiff that he could not return to work at the IRS.  On mental status, Plaintiff was frustrated and angry about his financial and work situations. He was dysphoric with a restricted affect.  Dr. Howsepian diagnosed dysthymic disorder, PTSD, adjustment disorder with anxiety and depression, learning disorder and pain disorder.  AR 749.

On June 10, 2008, Dr. Howsepian addressed a follow-up letter to the disability, reconsideration and appeals group regarding Plaintiff's denial for disability retirement.  Dr. Howsepian reported that Plaintiff's symptoms of depression, anxiety, irritability, dysphoria, explosivity, his shutting down emotionally, his exquisite sensitivity to stress, his substantial

elevations in blood pressure as a result of stress and anxiety and his having days when he scarcely gets out of bed "certainly qualifies as a disabling, serious psychiatric disturbance with significant deterioration from a prior level of functioning that can clearly causally be traced to stressors at the IRS." Dr. Howsepian indicated that he had written multiple letters to the IRS stating that, due to profound psychiatric reaction to stress in that context, Plaintiff was "wholly and completely disabled from employment at that institution." AR 745-46. .

On July 7 and 22, 2008, Plaintiff and his wife attended therapy sessions. Plaintiff's mood remained dysphoric. He was assessed with dysthymic disorder by history and anxiety disorder by history. AR 730-31, 733.

On July 28, 2008, Dr. Howsepian reported that Plaintiff was profoundly dysphoric, tearful, on the verge of decompensating, profoundly frustrated and hopeless and angry to the point of being rageful. He was out of money and on the verge of losing his home. Plaintiff denied suicidal ideation, stating he was more at risk of exploding and becoming violent if in a confrontation. Dr. Howsepian believed that Plaintiff was at significant risk of further decompensation. Plaintiff reportedly believed that whatever Dr. Kwock told him would determine which direction he needed to go, either definitive treatment so he can return to work or no treatment with persisting disability. AR 727-28.

On August 18, 2008, Dr. Howsepian stated that Plaintiff remained dysphoric and pessimistic. Plaintiff believed he was going to lose his house. Dr. Howsepian diagnosed anxiety and depression, dysthymic disorder, learning disorder and pain disorder. AR 722.

On September 9, 2008, Dr. Howsepian indicated that Plaintiff remained dysphoric and upset about his situation. Plaintiff reportedly became "especially angry" when any discussion of his returning to work was broached, claiming he would be fired after he called in sick. Plaintiff continued to hold out hope for disability. On mental status exam, Plaintiff was dysphoric, angry,

upset, depressed, hopeless and helpless.  Dr. Howsepian diagnosed "Anx and Dep adjustment, chronic," along with dysthymic disorder, learning disorder and pain disorder.  AR 713-14.

On December 15, 2008, Dr. Howsepian reported that Plaintiff was relatively stable and less angry, depressed and on edge than he had seen "in quite a while."  AR 684.

On January 21, 2009, Plaintiff sought treatment from Dr. Howsepian.  Plaintiff reported that neither he nor his primary care physician believed that the pain he was having (upper back, neck) were the result of shoulder pathology, but the surgeon wanted to proceed.  Although Plaintiff felt trapped, he was willing to have surgery so he did not appear to be refusing recommended treatment.  Plaintiff repeatedly asked why someone did not have the courage to put him on disability.   On mental status exam, Plaintiff was angry, frustrated and depressed.  Dr. Howsepian diagnosed dysthymic disorder, learning disorder, pain disorder, PTSD, and chronic adjustment disorder.  AR 676-77.

On July 14, 2009, Dr. Trevor Glenn conducted a compensation and pension examination to establish, if appropriate, a posttraumatic stress disorder diagnosis.  Dr. Glenn indicated that any conclusions in the examination report were provisional until completion of a c-file review.  Plaintiff provided a symptomology to include depression, sadness and crying spells.  Additionally, he experienced anhedonia, decreased energy and degreased initiative.  He also reported anger and irritability, losing control of his anger about once a week.  He had no other spontaneous symptomology.  Dr. Glenn indicated that Plaintiff seemed to equate the concept of depression with the concept of posttraumatic stress disorder.  On mental status, Plaintiff had difficulty focusing and was easily distractible.  He had impairment in his thought processes and communication in terms of concentration, focus and effort.  Dr. Glenn explained that the requirement for a stressor event in posttraumatic stress disorder is a person who actually experienced, witnessed or was confronted with an event or events that involved actual or threatened death or serious injury or a threat to the physical integrity of self or others.  Plaintiff identified

the Lebanon bombing of barracks as a stressor event, but he was stationed in Italy at the time.  It did not appear that he was a witness or experienced a traumatic event.  Dr. Glenn diagnosed major depression, recurrent, chronic in nature, moderate in degree.  Plaintiff did not appear to meet the criteria for posttraumatic stress disorder, but Dr. Glenn believed that Plaintiff showed a personality disorder not otherwise specified.  Plaintiff had a GAF of 55, which equated in social and occupational impairment "to a level of reduced reliability and productivity due to the major depression because of decrease in concentration, decrease in focus activity, irritability, anger control problems once a week and difficulty getting along in a work setting with much in the way of conflict."  AR 901.  Plaintiff also showed difficulty in establishing and maintaining effective work and social relationships.   AR 891-902.

On July 15, 2009, Dr. Glenn also conducted a comprehensive review of Plaintiff's C-file psychological records.  On examination, Plaintiff complained of depression, anger and irritability.  Dr. Glenn could not find any intrusive recollections that would enable Plaintiff to meet the criteria of posttraumatic stress disorder.  Based upon the records and an examination, Dr. Glenn opined that no diagnosis of posttraumatic stress disorder could be made because of a lack of linkage to specific stressor events.  However, Plaintiff had chronic dysthymia of longstanding duration, polysubstance dependence in full sustained remission and learning disorder not otherwise specified having to do with written expression, mathematics and spelling.  Plaintiff also had somatizing tendencies, but no personality disorder.  AR 574-84.

On July 20, 2009, Plaintiff complained to Anne Walker, a licensed clinical social worker in the Health Care for Homeless Veterans Program, about his housing setting.  He felt he was not being listened to and that he was "being singled out for more than the usual number of random toxicology test[s], especially since he does not believe he has a problem with alcohol or substances and only uses marijuana."  Plaintiff claimed that he was experiencing disturbed sleep, but he denied any significant disturbances related to his depression and anxiety.  He reportedly

was "slightly paranoid most of the time," but not delusional. His insight was superficial and his judgment impaired. AR 563.

On July 31, 2009, Plaintiff asked Ms. Walker to prepare a letter for his Social Security attorney. Plaintiff exhibited a degree of paranoia and a significant attitude of entitlement. He was argumentative and easily offended. AR 856-57.

On August 5, 2009, Ms. Walker affirmed that Plaintiff was participating in ongoing treatment for homeless veterans and was in a clean and sober housing setting. Plaintiff was eligible for residential treatment because he was homeless and without any income. He had diagnoses of dysthymic disorder, cervical radiculopathy, posttraumatic stress disorder, childhood abuse, disorders of bursae and tendons in shoulder region and adjustment disorder with mixed anxiety and depressed mood. AR 504.

On August 27, 2009, Ms. Walker noted that Plaintiff continued to create disruption and discontent with his complaints in the housing setting. Plaintiff denied any significant disturbances from depression and anxiety. AR 839.

On September 22, 2009, Ms. Walker met with Plaintiff following perceived threats to his housing roommate. Plaintiff was almost inarticulate because of anger and declined to discuss most subjects. He sat with his arms crossed and tolerated no discussion about issues. He admitted making statements to the house manager to warn his roommate and that he had anger control issues. Plaintiff was not sure he would be able to refrain from harming someone else. Ms. Walker scheduled Plaintiff an appointment with Dr. Howsepian. AR 834-35.

On September 22, 2009, Dr. Howsepian received communication from Ms. Walker, who was concerned that Plaintiff had access to a gun and might harm his roommate. Plaintiff assured Dr. Howsepian that he would not use his gun to harm himself or others. He did not threaten to harm his ex-roommate with a gun, but did threaten to harm him with his hands. On mental status, Plaintiff was quiet, dysphoric, depressed, irritable and angry. Dr. Howsepian diagnosed

dysthymic disorder, PTSD, learning disorder and adjustment overlay.  Plaintiff's mirtazapine was increased.  AR 833-34.

On October 6, 2009, Ms. Walker indicated that Plaintiff had located housing via the HUD VASH program.  When asked about depression and anxiety, Plaintiff denied any significant disturbances.  His insight and judgment were adequate.  AR 826.

On October 8, 2009, Ms. Walker indicated that Plaintiff was paranoid at some level, on an ongoing basis.  Plaintiff believed he was "frequently the sole object of someone 'not providing services . . .' or that that this person singles him out and picks on him."  His belief structure was unlikely to change significantly.   AR 825-26.

On October 21, 2009, Plaintiff was angry, irritable, frustrated, tense and depressed.  Dr. Howsepian diagnosed dysthymic disorder, PD NOS (provisional) and adjustment overlay.  Plaintiff was prescribed a trial of Abilify.  AR 822.  Plaintiff reportedly had opted to discontinue his involvement with his drug treatment maintenance program to spend time with his medically compromised brother.  AR 823.

On October 22, 2009, Dr. Howsepian prepared a Complete Medical Report (Mental) form.  He identified clinical findings of longstanding depression, anger, irritability, explosivity and emotional lability.  Plaintiff had diagnoses of dysthymic disorder, personality disorder NOS, obstructive sleep apnea, alcohol dependence (remission), pain disorder (chronic) and posttraumatic stress disorder.  Although Plaintiff was prescribed multiple medications, his response to treatment and prognosis were poor.  AR 812.

Dr. Howsepian also completed a Medial Assessment of Ability to Do Work-Related Activities (Mental) form.  He opined that Plaintiff had poor ability to follow work rules and to maintain attention/concentration.  Plaintiff had no ability to relate to co-workers, deal with public, use judgment, interact with supervisors or deal with work stress.  Dr. Howsepian explained that Plaintiff's intense anger, irritability, cognitive distortions, explosivity and

emotional instability resulted in "his reacting to perceived injustices & slights in a manner that is incompatible with gainful employment."  Plaintiff's interpersonal conflicts also were incompatible with "adequate functioning of the systems in which he is placed."  Dr. Howsepian noted that Plaintiff's anger and irritability impaired his judgment and disturbed his concentration. He was exquisitely vulnerable to stress and "when substantially stressed & confronted by those in authority, he [was] prone to become violent."  AR 813.  Plaintiff had no ability to behave in an emotionally stable manner, relate predictably in social situations or demonstrate reliability.  Dr. Howsepian concluded that even if Plaintiff were given a task that isolated him from others, "his perception of work rules, the system in which he is placed, & the work arrangements of others that might differ from his are subject to intense scrutiny and if/when problems are found, he is liable to react strongly."  AR 814.

Dr. Howsepian also completed a Medical Source Statement Psychiatric form.  He opined that Plaintiff had extreme limitations in the ability to relate and interact with supervisors and co-workers, in the ability to deal with the public, in the ability to maintain concentration and attention for at least two hour increments, in the ability to withstand the stress and pressures associated with an eight-hour workday and day-to-day work activity.  Plaintiff also had marked limitations in the ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions and moderate limitations in the ability to understand, remember, and carry out simple one-or-two job instructions.  AR 815.

The same day, therapist O'Rourke completed a discharge summary from chemical dependence maintenance treatment and assigned Plaintiff a GAF of 68-70.  AR 821.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through September 30, 2011, and had not engaged in substantial gainful activity since August 31, 2007.  The ALJ further found that Plaintiff had the severe impairments of depressive disorder and hearing loss.

Despite these impairments, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform the full range of work at all exertional levels with limitation to simple, repetitive tasks and avoiding concentrated exposure to loud noise. With this RFC, the ALJ concluded that Plaintiff could perform jobs existing in the national economy.  AR 15-22.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405(g).  Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. § 404.1520(a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since his alleged onset date; (2) has an impairment or a combination of impairments that is considered "severe" (depressive disorder and hearing loss) based on the requirements in the Regulations (20 C.F.R. § 404.1520(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy. AR 15-22.

Here, Plaintiff contends that the ALJ erred by: (1) improperly evaluating medical evidence of Plaintiff's mental and physical impairments; (2) improperly rejecting lay witness testimony; and (3) improperly finding that Plaintiff could perform other jobs in the national economy at Step Five of the sequential evaluation. Additionally, Plaintiff argues that the ALJ was biased.

## DISCUSSION

A. Evaluation of Medical Evidence

1. Mental Impairments

Plaintiff first argues that the ALJ improperly evaluated medical evidence of his mental impairments. In particular, Plaintiff asserts that the ALJ erroneously rejected the opinion of his treating psychiatrist, Dr. Howsepian. The Court agrees.

The opinions of a claimant's treating physicians are entitled to more weight than the opinions of doctors who do not treat the claimant. 20 C.F.R. § 404.1527(d)(2); *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007). Only if there is substantial evidence in the record contradicting the opinion of the treating physicians are their opinions no longer entitled to controlling weight. *Id.* at 632. Even in that instance, the opinions of treating physicians are still entitled to deference. *Id.* If the ALJ disregards the opinions of the treating physicians, he must make findings setting forth specific and legitimate reasons for doing so. *Id.*

Here, Dr. Howsepian opined in October 2009 that Plaintiff had no ability to follow work rules, to maintain attention/concentration, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stress, to behave in an emotionally stable manner, to relate predictably in social situations or to demonstrate reliability. AR 813. The ALJ assigned this opinion "little, if any weight," stating that it was "not consistent with the claimant's admitted history of functioning" because he was able to work full time in 2003, 2004 and 2005. AR 20. This is not a legitimate reason to reject Dr. Howsepian's opinion. As a general matter, a treating physician's opinion may be discounted where it is inconsistent with a claimant's daily functioning. *See, e.g., Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Contrary to the ALJ's statement, however, evidence that Plaintiff was able to work full time well before his alleged onset date in 2007 is not inconsistent with Dr. Howsepian's 2009 assessment of Plaintiff's functional limitations.

The ALJ also purported to assign little weight to Dr. Howsepian's opinion because it was not consistent with medical records from the Veteran's Administration. AR 20. Ordinarily, inconsistency with the medical record is a specific and legitimate reason for affording a treating physician's opinion less weight. *See, e.g., Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Magallanes v. Bowen*, 881 F.2d 747, 751-52 (9th Cir. 2001). In this instance, however, the ALJ identified only one record to suggest an inconsistency; that is, a group therapy discharge

summary assigning Plaintiff a GAF of 68-70 on the same date of Dr. Howsepian's 2009 opinion. AR 20, 821. This is not legitimate for several reasons.

First, as outlined above, Dr. Howsepian's opinion is supported by objective medical findings in his own treatment records, along with record evidence from Dr. Glenn. AR 891-902. Second, the GAF of 68-70 was assigned by Thomas O'Rourke, an addiction therapist, who is not considered an acceptable medical source. 20 C.F.R. § 404.1513(a), (d) ("acceptable medical sources" include licensed physicians and psychologists, but not therapists). Non-acceptable medical sources cannot establish the existence of a medically determinable impairment, cannot give medical opinions, and cannot be considered treating sources whose opinions are entitled to controlling weight. Social Security Ruling 06-03p. Third, and finally, a GAF score is not determinative of mental disability or a claimant's limitations for social security purposes. *See, e.g., Lillard v. Astrue*, 2011 WL 1344556, *2 n. 2 (C.D. Cal. Apr. 7, 2011) (citing 65 Fed. Reg. 50746, 50764-50765 (Aug. 21, 2000)).

The Commissioner counters that the ALJ properly rejected Dr. Howsepian's opinion in favor of the consultative examiner, Dr. Swanson, who assigned Plaintiff a GAF of 70 and concluded that Plaintiff could understand, remember and carryout simple instructions. AR 20, 293. The ALJ assigned Dr. Swanson's opinion "substantial weight," stating that it was consistent with the overall evidence of record. AR 20. Generally, the opinions of non-treating physicians may "serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence on the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002). In this case, however, the ALJ failed to explain how Dr. Swanson's opinion was consistent with the overall evidence of record. This failure is particularly significant given that Dr. Swanson's opinion was inconsistent with substantial evidence in the record from Plaintiff's treating physician, Dr. Howsepian. As discussed above, the ALJ erred in discounting Dr. Howsepian's opinion.

For the reasons stated, the Court finds that the ALJ erred in his evaluation of the medical evidence regarding Plaintiff's mental impairments.

2. Physical Impairments

Plaintiff next argues that the ALJ improperly evaluated medical evidence of his physical limitations. Specifically, Plaintiff argues that the ALJ erred at step two by finding that Plaintiff "did not have any severe physical impairments other than hearing loss." Opening Brief, p. 27. Plaintiff believes that the ALJ should have found severe impairments resulting from his neck and shoulder pain at step two. The Ninth Circuit has defined the step-two inquiry as "a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1272, 1290 (9th Cir. 1996). An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *Id.* Here, substantial evidence supports the ALJ's step two determination that Plaintiff's neck and shoulder pains were nonsevere impairments. AR 17. In November 2007, a consultative internal medical exam revealed no abnormal physical findings or limitations. AR 374-78. In July 2009, Dr. Mehta found that Plaintiff did not have any limitations in his activities, his neck movements were performed fairly well, he had normal power and coordination in both upper and lower extremities and had no cervical radiculopathy symptoms despite cervical spondylosis and bulging disc on a MRI scan. AR 564-69. In October 2009, Dr. Singh diagnosed only shoulder and neck "strain." AR 830. Plaintiff has not identified any contrary opinions to establish that his neck and shoulder pain resulted in more than a minimal effect on his ability to work.

B. Lay Testimony

Plaintiff next argues that the ALJ improperly rejected the lay testimony of his ex-wife, Victoria Howard. Ms. Howard provided a third party report of Plaintiff's functioning. She indicated that Plaintiff "does some housework, pet care, some cooking, plays on computer" and

sometimes visits friends.  Although his pain levels affected his sleep, Plaintiff had no problem with personal care, sometimes cooked whole meals, vacuumed, ironed, cleaned cages, washed dishes, shopped, watched TV, read, and regularly attended Temple, along with hockey and baseball games.  Ms. Howard also reported that Plaintiff had difficulty lifting, reaching, hearing, completing tasks and following instructions.   AR 169-76.  An ALJ "must consider competent lay testimony" and may only discount such testimony by providing reasons that are "germane" to the witness.  *Carmickle v. Comm'r, Social Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).  Here, the ALJ not only considered the testimony of Plaintiff's ex-wife, but also afforded it "substantial weight."  AR 20.  Indeed, the ALJ credited Ms. Howard's report of Plaintiff's activities of daily living, his limited ability to follow instructions and his hearing loss.  AR 20-21.  Although Plaintiff disagrees with the ALJ's interpretation of this evidence, the court will not disturb the ALJ's rational findings of fact.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

    C.    <u>Step Five</u>

Plaintiff argues that the ALJ erred at step five of the sequential evaluation by failing to incorporate all of his functional limitations in the RFC assessment.  As discussed above, the ALJ erroneously assessed the evidence regarding Plaintiff's mental impairments.  Accordingly, the Court finds that the RFC assessment may have been flawed, along with the ALJ's step five findings.

    D.    <u>ALJ Bias</u>

Plaintiff contends that ALJ Berry is biased because of his systematic denial of claims brought by Plaintiff's counsel.  However, ALJs "are presumed to be unbiased." *Rollins*, 261 F.3d at 857.  A claimant asserting bias must "show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"  *Id.* at 858 (quoting *Liteky*

*v. United States*, 510 U.S. 540, 555-56 (1994)).    According to the record, the ALJ did not engage in any behavior so extreme as to display a clear inability to render fair judgment. Plaintiff has failed to point to any evidence of bias in the context of this case.

     E.    <u>Remand</u>

     Section 405(g) of Title 42 of the United States Code provides: "the court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."   In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court.   *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 19)89).   "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.   Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate."   *Id.* (citation omitted).   Indeed, it is appropriate to credit evidence and direct an award of benefits where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the clamant disabled were such evidence credited.   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2)000).

     As there are conflicting medical opinions regarding Plaintiff's mental impairments and because substantial evidence suggests that Plaintiff may have greater restrictions, outstanding issues remain that must be resolved before a determination of benefits can be made.  The Court therefore finds that remand is appropriate to allow proper consideration of the medical evidence

of Plaintiff's mental impairments and to make a new determination regarding Plaintiff's

entitlement to disability benefits.

## **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision was not supported by

substantial evidence and was not based on proper legal standards.  Accordingly, the Court

RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of

Social Security be GRANTED and that JUDGMENT be entered for Plaintiff Donald Schneider

and against Defendant Michael J. Astrue.

These Findings and Recommendations are submitted to the Honorable Anthony W. Ishii,

United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 631(b)(1)(B) and

Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

California.  Within **fourteen (14) days** after being served with a copy, any party may serve on

opposing counsel and file with the court written objections to such proposed findings and

recommendations.  Such a document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Replies to the objections shall be served and filed within

**fourteen (14) days** after service of the objections.  The Court will then review the Magistrate

Judge's ruling pursuant to 28 U.S.C. § 636(b)(1).


IT IS SO ORDERED.

Dated:   **August 28, 2012**                    _____ /s/ *Dennis L. Beck*

                                    UNITED STATES MAGISTRATE JUDGE